# IN THE SUPREME COURT OF THE STATE OF NEVADA

J.W. BENTLEY AND MARYANN BENTLEY TRUSTEES OF THE BENTLEY FAMILY 1995 TRUST; JOY SMITH; DANIEL BARDEN; AND ELAINE BARDEN,
Appellants,
vs.
STATE OF NEVADA, OFFICE OF THE STATE ENGINEER; DONALD S. FORRESTER AND KRISTINA M. FORRESTER; HALL RANCHES, LLC; THOMAS J. SCYPHERS AND KATHLEEN M. SCYPHERS; FRANK SCHARO; SHERIDAN CREEK EQUESTRIAN CENTER, LLC; AND RONALD R. MITCHELL AND GINGER G. MITCHELL,
Respondents.

No. 64773

FILED

JUL 1 4 2016

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

J.W. BENTLEY; MARYANN BENTLEY, TRUSTEES OF THE BENTLEY FAMILY 1995 TRUST; JOY SMITH; DANIEL D. BARDEN; AND ELAINE BARDEN,
Appellants,
vs.
HALL RANCHES, LLC; THOMAS J. SCYPHERS; KATHLEEN M. SCYPHERS; FRANK SCHARO; SHERIDAN CREEK EQUESTRIAN CENTER, LLC, A NEVADA LIMITED LIABILITY COMPANY; DONALD S. FORRESTER; KRISTINA M. FORRESTER; RONALD R. MITCHELL; AND GINGER G. MITCHELL,
Respondents.

No. 66303

J.W. BENTLEY; AND MARYANN BENTLEY, TRUSTEES OF THE BENTLEY FAMILY 1995 TRUST,

No. 66932

SUPREME COURT
OF
NEVADA

(O) 1947A

16-22042

Appellants,

vs.

THE STATE OF NEVADA STATE ENGINEER; HALL RANCHES, LLC; THOMAS J. SCYPHERS; KATHLEEN M. SCYPHERS; FRANK SCHARO; SHERIDAN CREEK EQUESTRIAN CENTER, LLC; DONALD S. FORRESTER; KRISTINA M. FORRESTER; RONALD R. MITCHELL; AND GINGER G. MITCHELL, Respondents.

## *ORDER OF AFFIRMANCE*

These are consolidated appeals from district court orders denying petitions for judicial review of the State Engineer's water use rotation schedules (Docket No. 64773) and awarding costs (Docket No. 66303) and from a district court decree affirming, as modified, the State Engineer's order of determination (Docket No. 66932) in a water rights matter. Ninth Judicial District Court, Douglas County; Nathan Tod Young and David R. Gamble, Judges.

Appellants J.W. Bentley and Maryann Bentley, trustees of the Bentley family trust (collectively, the Bentleys); Joy Smith; Daniel and Elaine Barden; and respondents Donald S. and Kristina M. Forrester; Hall Ranches, LLC; Thomas J. and Kathleen Scyphers; Frank Scharo; Sheridan Creek Equestrian Center, LLC; and Ronald R. and Ginger G. Mitchell (collectively, Intervenors) are water rights holders of equal priority of the waters of North Sheridan Creek in Carson Valley. The North Sheridan Creek is the northern branch of the Sheridan Creek. In 1987, a petition was filed with the State Engineer requesting a determination of the relative rights of the claimants to the waters of several stream systems

flowing into the Carson Valley, including the North Sheridan Creek. In 2008, the State Engineer issued a Final Order of Determination (FOD) regarding these stream systems and filed it with the district court. The district court divided the proceeding into six groups based on the common water source in each set of exceptions filed by water users protesting the FOD, with the waters of North Sheridan Creek adjudicated under subpart D of the overall decree. In the FOD, the State Engineer indicated that in times of low flow from the North Sheridan Creek the water users would have to share the shortage through the imposition of a rotation schedule.

As provided under NRS 533.170, the Bentleys filed a notice of exceptions to the FOD with the district court, asserting that they had the right to continuously divert water to their ponds under a 1987 diversion agreement and, thus, could not be subjected to a rotation schedule, whereby the use of the full flow of the North Sheridan Creek was rotated among the water rights holders. The district court found that Intervenors had an interest in the proceedings, were aligned with the State Engineer, and supported the FOD against the Bentleys' exceptions. Therefore, the district court permitted the Intervenors to intervene in the case and to challenge the Bentleys' right to enforce the diversion agreement, as opposed to filing exceptions to the FOD itself. The Intervenors alleged that the Bentleys' ponds consumed excessive amounts of water, which resulted in reduced downstream flows to their properties, and that the diversion agreement was invalid.

In 2010, the district court imposed an interim rotation schedule on the water users, although the record does not reflect the details of this rotation schedule. After a trial on the Bentleys' notice of exceptions, the district court issued its Findings of Fact, Conclusions of

Law, Order and Judgment as to subpart D, which affirmed, as modified, the FOD. As relevant here, the FOD was modified to (1) declare the diversion agreement to be unenforceable, invalid, and ineffective, (2) require the State Engineer to impose a rotation schedule upon the North Sheridan Creek water rights holders when the flow of the creek falls below 2.0 cubic feet per second (cfs), and (3) award Intervenors their costs and reasonable attorney fees. The district court based its decision on a finding that whenever the North Sheridan Creek flow is below 2.0 cfs, constant flow to the Bentleys' ponds injured other water users and a rotation schedule was necessary to avoid that injury.

Consistent with the district court's judgment, in 2012, the State Engineer notified the North Sheridan Creek water rights holders that the measured flow had dropped below 2.0 cfs and that a rotation schedule was in effect. A rotation schedule was also in effect during the 2013 irrigation season. The Bentleys, Smith, and the Bardens separately petitioned the district court for judicial review of the 2012 rotation schedule. In 2013, they jointly petitioned the district court for judicial review of the 2013 rotation schedule. The 2012 and 2013 petitions were consolidated, and on November 27, 2013, the petitions were denied by the district court, which summarily stated that it did not find the rotation order to be illegal and that it was not the court's function to readdress the prior judgment entered as to subpart D. The Bentleys, Smith, and the Bardens have appealed the district court's decision in Docket No. 64773. The district court subsequently awarded costs to Intervenors, and the Bentleys, Smith, and the Bardens have appealed that decision in Docket No. 66303.

In 2014, the district court issued a final decree regarding the relative water rights of the Carson Valley stream systems, which included its 2012 decision regarding North Sheridan Creek, adjudicated under subpart D. The Bentleys have appealed the decree in Docket No. 66932, and that appeal has been consolidated with the appeals in Docket Nos. 64773 and 66303.

On appeal, the Bentleys, Smith, and the Bardens raise the following issues: (1) whether the district court had jurisdiction to impose a rotation schedule; (2) whether the State Engineer had the authority to impose a nonconsensual rotation schedule, acted arbitrarily and capriciously in imposing a rotation schedule, and did not have substantial evidence to support its decision to impose a rotation schedule; (3) whether the 1987 diversion agreement is invalid and/or was breached by the Bentleys; and (4) whether the district court abused its discretion in awarding attorney fees and costs to Intervenors.

*The proceedings were statutory in nature*

There are two types of water law adjudications: statutory and equitable. James H. Davenport, *Nevada Water Law* 98 (Colo. River Comm'n of Nev. 2003). Before enactment of this State's water law, which created the statutory adjudication process, the settlement of disputes between competing water claimants upon the same stream or stream system was conducted by the courts pursuant to their equitable jurisdiction. *See Bliss v. Grayson*, 24 Nev. 422, 455, 56 P. 231, 241 (1899) ("[T]he foundation of the right to invoke the equity powers of the court, in restraint of nuisances to water, before the enactment of our statute, was based almost solely upon the infringement of riparian rights."). Equitable jurisdiction is typically invoked by the filing of a quiet title action. *See Margrave v. Dermody Props., Inc.*, 110 Nev. 824, 827, 878 P.2d 291, 293

(1994) (stating that a water rights holder invoked equity jurisdiction by a quiet title action); *see also Dermody v. City of Reno*, 113 Nev. 207, 209-10, 931 P.2d 1354, 1356 (1997) (stating the same).

Statutory adjudications occur when the State Engineer files with the district court an FOD as to a water system. Davenport, *supra*, at 104. The purpose of a statutory adjudication is to have water rights "adjudicated in such a proceeding as to terminate for all time litigation between all such water users." *Ruddell v. Sixth Judicial Dist. Court*, 54 Nev. 363, 367, 17 P.2d 693, 695 (1933). In the current case, the State Engineer entered an FOD and the Bentleys filed exceptions thereto determining the water rights of the North Sheridan Creek users and filed the FOD with the district court pursuant to NRS 533.090 and NRS 533.165. Accordingly, this is a statutory adjudication, not an equitable adjudication.

*The district court had jurisdiction to consider the issue of whether a rotation schedule should be imposed*

NRS 533.170(2) states that "[t]he order of determination by the State Engineer and the statements or claims of claimants and exceptions made to the order of determination shall constitute the pleadings, and there shall be no other pleadings in the cause." "It is . . . settled in this state that the water law and all proceedings thereunder are special in character and the provisions of such law not only lay down the method of procedure, but strictly limit it to that provided." *G. & M. Props. v. Second Judicial Dist. Court*, 95 Nev. 301, 305, 594 P.2d 714, 716 (1979) (quotation omitted). Therefore, the district court only has jurisdiction in a statutory adjudication to consider issues raised in the proper pleadings established by statute.

In this case, the establishment of a mandatory rotation schedule was raised in the FOD and exceptions. The FOD stated, in relevant part, that

> [t]he diversion rates for the north and south split of Sheridan Creek are based on a spring and early summer average stream flow of 3.5 c.f.s. Flow and diversion rates during periods of drought and middle to late irrigation season will generally be less than the rates determined in the Preliminary Order of Determination. *Therefore, all parties will have to share the water shortage during periods of low flow. The total diversion from either the north or south split can be used in its entirety in a rotation system of irrigation.*

(Emphasis added). By stating that "all parties will have to share the water shortage" during times of low flow through "a rotation system of irrigation," the State Engineer indicated that a mandatory rotation schedule would be imposed in times of low flow.

This appears to be the Bentleys' interpretation of the FOD as well. In their notice of exceptions, the Bentleys' Exception No. 1 argued that their diversion rights "should not be subject to rotation" and that "the Bentley property should be exempt from the rotation" that the "Office of the State Engineer is likely to impose." Therefore, because the rotation schedule was properly raised in the FOD and the Bentleys' exceptions, we hold that the district court had jurisdiction to consider this issue.

*The pre-trial stipulation did not preclude the district court from imposing a mandatory rotation schedule*

The Bentleys argue that because the parties stipulated that a rotation schedule would not be imposed, the district court could not later impose one. The parties stipulated, in relevant part,

> that the State Engineer would not attempt to include a rotation schedule in the Decree itself,

but that the provisions of NRS 533.075 and the order of this Court would be used to determine when and if a rotation schedule is needed to efficiently use the waters of the State of Nevada. However, Bentley reserves all objections to the imposition of a rotation schedule, including objection about the statutory authority to do so.

Thus, the stipulation can be reasonably interpreted to mean that the parties only stipulated that a specific rotation schedule, such as the times each water rights holder would get the full stream in the rotation, would not be put into the Decree itself, not that a rotation schedule could not be imposed by the district court. Otherwise, the second part of the stipulation would lack meaning and the Bentleys would have no need to reserve objections to the imposition of a rotation schedule if the parties had stipulated as they suggest. Therefore, we hold that the pre-trial stipulation did not affect the jurisdiction of the district court to consider imposing a mandatory rotation schedule.[1]

---

[1]The dissent argues that the issue of the imposition of a mandatory rotation schedule was not fully developed in the proceedings before the district court. We disagree. Evidence was presented by the State Engineer that he performed seepage tests on the Bentleys' ponds which showed that the Bentleys consumed more than their proportional share of water when they received a continuous flow. Testimony was also presented by the Intervenors that they received reduced downstream flows to their properties after the Bentleys' new pond was constructed, but, after an interim rotation schedule was implemented, they were able to fully water their properties. This clearly shows that imposition of a mandatory rotation schedule was developed below and that a rotation schedule was necessary for all water users to receive their apportioned share of the water rights. To suggest otherwise is not accurate.

*The district court had jurisdiction to impose a rotation schedule*

The Bentleys argue that although NRS 533.075 authorizes water rights holders to rotate their use of a water supply to which they are collectively entitled, it does not authorize the district court or the State Engineer to impose a rotation schedule in a water rights adjudication process to force nonconsenting water users to participate in rotation, nor does any other provision in NRS Chapter 533. The Bentleys also argue that the district court did not have jurisdiction to impose a rotation schedule as part of a statutory adjudication.[2]

*NRS 533.075 does not limit the power of the district court to impose a rotation schedule*

"When a statute is clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of construction." *Cromer v. Wilson*, 126 Nev. 106, 109, 225 P.3d 788, 790 (2010).

NRS 533.075 states:

> To bring about a more economical use of the available water supply, it shall be lawful for water users owning lands to which water is appurtenant to rotate in the use of the supply to which they

---

[2]The Bentleys also argue that the rotation schedule allows Intervenors to use commingled water from Gansberg Spring, to which they have no rights. The water of Gansberg Spring does not flow at the same rate at all times of the year and generally contributes a small and variable percentage of the total flow. The district court found that it did not justify a water commissioner to regulate the flow separately. Because the Bentleys provide no authority for why the district court's decision regarding Gansberg Spring should be overturned, we decline to consider this issue. *See Schwartz v. Eliades*, 113 Nev. 586, 590 n.3, 939 P.2d 1034, 1036 n.3 (1997) ("This court will not consider an issue if no relevant authority is presented on appeal.").

may be collectively entitled; or a single water user, having lands to which water rights of a different priority attach, may in like manner rotate in use, when such rotation can be made without injury to lands enjoying an earlier priority, to the end that each user may have an irrigation head of at least 2 cubic feet per second.

The Bentleys argue that because NRS 533.075 only authorizes the imposition of a rotation schedule to situations where all of the water users agree to it, the district court had no authority to impose an involuntary rotation schedule. However, while it is true that NRS 533.075 only explicitly authorizes voluntary rotation schedules, it also does *not* limit the power of the district court to impose an otherwise involuntary rotation schedule after the jurisdiction of the district court has been properly invoked. As noted above, the FOD and the exceptions filed thereto, afford the district court jurisdiction in this matter to consider the imposition of a rotation schedule. Therefore, the Bentleys' reliance on NRS 533.075 is misplaced.

*The State Engineer acted within his capacity as an officer of the court when he implemented the rotation schedule*

In addition to challenging the district court's authority to impose a rotation schedule, the Bentleys, Smith, and the Bardens also challenge the State Engineer's enforcement of the district court's order.[3] Smith and the Bardens argue that the State Engineer did not have the authority to impose a nonconsensual rotation schedule, acted arbitrarily and capriciously in imposing a rotation schedule, and did not have substantial evidence to support its decision to impose a rotation schedule.

---

[3]This was the subject of the two petitions for judicial review whose appeals were consolidated with the current appeal.

SUPREME COURT
OF
NEVADA

(O) 1947A

NRS 533.220(1) states:

> From and after the filing of the order of determination in the district court, the distribution of water by the State Engineer or by any of the State Engineer's assistants or by the water commissioners or their assistants shall, at all times, be under the supervision and control of the district court. *Such officers and each of them shall, at all times, be deemed to be officers of the court in distributing water* under and pursuant to the order of determination or under and pursuant to the decree of the court.

(Emphasis added.) Thus, when the State Engineer implements an order of determination or decree, it is acting as an officer of the court.

Here, the district court's order as to subpart D stated that "[w]hen the combined flow from the North Diversion of Sheridan Creek and tributaries drops below 2.0 cfs, the State Engineer *shall* impose a rotation schedule." (Emphasis added.) Thus, when the North Sheridan Creek flow fell below 2.0 cfs, the State Engineer, acting as an officer of the court, was required to impose a rotation schedule. Smith and the Bardens do not dispute that the State Engineer's measurement of the North Sheridan Creek flow or the State Engineer's apportionment of water in the rotation schedule was incorrect. Rather, they argue that the State Engineer did not have the authority to impose a nonconsensual rotation schedule, acted arbitrarily and capriciously in imposing a rotation schedule, and did not have substantial evidence to support its decision to impose a rotation schedule. These are arguments more appropriate for challenging the validity of the district court's order, not the State Engineer's implementation of its order. When implementing the district court's order to impose a rotation schedule as an officer of the court, the State Engineer was not required to ascertain whether the district court

had the authority to impose a rotation schedule on nonconsenting water users with equal priority of rights or whether substantial evidence supported that decision, and its actions cannot be challenged on that basis. Therefore, we hold that the State Engineer was not acting arbitrarily or capriciously and there was substantial evidence in support of his actions when he imposed a rotation schedule.[4]

*The diversion agreement*

One of the exceptions to the FOD made by the Bentleys asserted that they had the right to continuously divert water to their ponds under the diversion agreement and therefore could not be forced to participate in a rotation schedule with the other water rights holders. That diversion agreement, which was drafted in 1986, purportedly granted the Bentleys' predecessor-in-interest, Joseph Lodato, a continuous flow of water for the purpose of maintaining the water level in the streams and ponds on Lodato's property. Although the diversion agreement stated that the Rolphs and Gerald F. and Pamela F.J. Whitmere were the owners of the Sheridan Creek water rights and, collectively as grantors, granted the Bentleys' predecessor-in-interest, Lodato, the right to divert some or all of the Sheridan Creek water to maintain water levels in ponds then existing on Lodato's property, the Rolphs never signed the agreement. At the time when the agreement was drafted, water was diverted into only one pond

---

[4]The Bentleys also argue that they were entitled to judicial review. Their argument on this point is unclear but appears to allege that their petitions for judicial review were denied by the district court on the basis of issue preclusion. However, the district court's order did not mention issue preclusion, and our review of the order does not indicate that it was based on issue preclusion. Therefore, the Bentleys' argument is without merit.

(the lower pond) located on the Lodato property. In 1987, Lodato recorded the diversion agreement.

The Bentleys purchased the Lodato property in 2006. In 2008, the Bentleys constructed a new, larger pond on the property (the upper pond). The Bentleys then constructed a pipe from the water distribution box to the upper pond and another pipe or ditch from the upper pond to the lower pond. Lastly, they constructed a pipe to allow overflow from the two ponds to reach their downstream neighbors. According to the Bentleys, these actions were permissible under the diversion agreement and did not amount to consumptive use.

The district court permitted the Intervenors to intervene in the case to challenge the Bentleys' right to enforce the diversion agreement. At trial, the Intervenors testified that the Bentleys' combined ponds use significantly more water than the previous single pond, resulting in the downstream users receiving no water during times of low flow. The district court held that the diversion agreement was invalid because it was not executed by the Rolphs and that, regardless, the Bentleys violated the terms of the agreement by using the waters for a consumptive use.

The Bentleys argue that the district court erred in declaring the diversion agreement invalid because the Rolphs were not necessary parties to the agreement, and the Bentleys' use of the water is for a nonconsumptive use.

*Intervenors' response and objections to the Bentleys' notice of exceptions was a proper pleading*

As a preliminary matter, the Bentleys contend that NRS 533.170 prohibits any pleadings in response to exceptions filed to the FOD. Therefore, because the Intervenors argued that the diversion

agreement was invalid in a reply to the Bentleys' exception, the district court erred by not dismissing it as an improper affirmative defense.

"Even parties who fail to take exceptions to an adjudication when reviewed upon appeal are entitled to participation in consideration of the adjudication." *Davenport, supra*, at 110. "An adjudication is not a separable controversy between a few claimants." *Id.* "[A]ll claimants or water users in [a water rights] adjudication proceeding under the [water statutes] are adverse." *In re Water Rights in Silver Creek & Its Tributaries*, 57 Nev. 232, 238, 61 P.2d 987, 989 (1936).

NRS 533.170(2) states that "[t]he order of determination by the State Engineer and the statements or claims of claimants and exceptions made to the order of determination shall constitute the pleadings, and there shall be no other pleadings in the cause." "The purpose of the law is to limit the questions to be decided in the adjudication proceedings to issues raised by exceptions duly filed." *Carpenter v. Sixth Judicial Dist. Court*, 59 Nev. 42, 46, 73 P.2d 1310, 1311 (1937). Thus, contrary to the Bentleys' assertions, NRS 533.170 does not prohibit *any* further pleadings—it simply limits the scope of all further pleadings to the issues raised by the exceptions while encouraging complete resolution of questions raised by the claimants.

Here, the Bentleys filed an exception stating that they should not be subject to any rotation schedule because the diversion agreement gave them the right to divert the North Sheridan Creek for use in their ponds. Intervenors were permitted to intervene and challenge the Bentleys' right to enforce the diversion agreement and thus their right to a continuous flow from the North Sheridan Creek at the Intervenors'

Supreme Court
OF
Nevada

(O) 1947A

14

expense. Because the Intervenors' pleading was not outside the scope of the Bentleys' exception, we hold that it was a proper pleading.

*The district court had jurisdiction to consider whether the diversion agreement was valid*

The Bentleys argue that because statutory water adjudications are limited in scope to determining the relative rights of the claimants, the district court did not have jurisdiction to determine whether the diversion agreement was valid.

As previously stated, the purpose of a statutory adjudication is to have water rights "adjudicated in such a proceeding as to terminate for all time litigation between all such water users." *Ruddell*, 54 Nev. at 367, 17 P.2d at 695.

The Bentleys' argument is without merit. The validity of a diversion agreement, which the Bentleys purport grants them the right to divert water from the North Sheridan Creek in perpetuity, is within the scope of an adjudication to determine the relative water rights of the North Sheridan Creek. Furthermore, the failure to resolve the enforceability of the diversion agreement would invite immediate further litigation between the North Sheridan Creek water rights holders. Therefore, we hold that the district court had jurisdiction to consider the validity of the diversion agreement.[5]

---

[5]The Bentleys also argue that the district court's Findings of Fact, Conclusions of Law, Order and Judgment was not incorporated into the district court's final decree. However, as the final decree specifically references the Findings of Fact, we hold that it was incorporated into the decree.

*The Bentleys breached the agreement by using the water in a consumptive manner by diverting it into the upper pond*

"Contract interpretation is a question of law and, as long as no facts are in dispute, this court reviews contract issues de novo, looking to the language of the agreement and the surrounding circumstances." *Redrock Valley Ranch, LLC v. Washoe Cty.*, 127 Nev. 451, 460, 254 P.3d 641, 647-48 (2011). "A basic rule of contract interpretation is that [e]very word must be given effect if at all possible." *Bielar v. Washoe Health Sys., Inc.*, 129 Nev., Adv. Op. 49, 306 P.3d 360, 364 (2013) (alteration in original) (internal quotations omitted). "A court should not interpret a contract so as to make meaningless its provisions." *Id.* (internal quotations omitted). "A contract should not be construed so as to lead to an absurd result." *Reno Club, Inc. v. Young Inv. Co.*, 64 Nev. 312, 325, 182 P.2d 1011, 1017 (1947).

> The diversion agreement states, in relevant part:
>
> This grant is specifically made on the condition that the water will be used by Grantee in a non-consumptive fashion, to maintain water levels in a series of streams and ponds on the Exhibit "A" property, after which time it will be re-diverted to the irrigation ditches of Grantors.

The agreement does not otherwise define "nonconsumptive fashion," and the referenced "Exhibit A" only describes the boundaries of the property, not the streams and ponds found on it.

The State Engineer performed seepage tests on each of the Bentleys' ponds and found that the ponds lost water from seepage, evaporation, and transpiration. Basing its holding on the seepage test results, the district court held that because the Bentleys' ponds "consumed" water, the Bentleys violated the terms of the diversion agreement.

The Bentleys argue that because the diversion agreement specifically allows the grantee to maintain the water level in a series of streams and ponds on the property, the Bentleys' use to maintain the water level in the ponds, including the upper pond, is not a consumptive use as described by the agreement. The Bentleys are at least partially correct. By specifically stating that the purpose of the diversion agreement was to *maintain* water levels in the streams and ponds on the Bentleys' property, the drafters of the diversion agreement contemplated that the ponds would consume some water—otherwise, the diverted water would be unnecessary. Likewise, although the ponds consumed some water, the diversion agreement considered such usage to be nonconsumptive, as that term is used by the agreement. If this was considered to be a consumptive use violating the terms of the agreement, then the agreement would be invalid on its face. As this would be an absurd result, we hold that maintaining water levels in the streams and ponds existing on the Bentleys' property in 1987 is not a consumptive use as contemplated by the diversion agreement.

However, this court must also give effect to the requirement in the agreement that the diverted water must be used in a nonconsumptive manner and that after such use, the water must be "re-diverted to the irrigation ditches of Grantors." *See Bielar*, 129 Nev., Adv. Op. 49, 306 P.3d at 364. The agreement appears to contradict itself by granting the Bentleys the right to use North Sheridan Creek for the undoubtedly consumptive use of maintaining their pond but also requiring that the use be "non-consumptive" and re-divert water to the irrigation ditches of downstream water rights holders. These two contradictory statements can be reconciled by interpreting the agreement's scope of nonconsumptive

uses to only apply to the maintenance of the streams and ponds on the Bentleys' property *as they existed at the time of the agreement*. Otherwise the agreement could be construed to permit the absurd result of allowing the Bentleys to construct as many ponds as they wished and completely consume the water of the North Sheridan Creek, even in times of high flow, and nonetheless have it count as a nonconsumptive use.

Here, the evidence shows that the Bentleys not only used the North Sheridan Creek water to maintain the streams and ponds existing on their property when the agreement was signed, they also dug a new, larger pond and used the North Sheridan Creek to maintain the water in that pond. The State Engineer's seepage tests of the Bentleys' ponds show that the Bentleys consumed twice as much water after the second pond was constructed as they did prior to that time. Therefore, we hold that the Bentleys breached the diversion agreement when they constructed a second pond on their property and used the North Sheridan Creek to maintain its water levels.

*The district court's finding that the diversion agreement was not a valid contract is not clearly erroneous and is supported by substantial evidence*

"[W]hether a contract exists is [a question] of fact, requiring this court to defer to the district court's findings unless they are clearly erroneous or not based on substantial evidence." *Certified Fire Prot., Inc. v. Precision Constr., Inc.*, 128 Nev. 371, 378, 283 P.3d 250, 255 (2012) (alterations in original) (internal quotations omitted). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." *Whitemaine v. Aniskovich*, 124 Nev. 302, 308, 183 P.3d 137, 141 (2008).

"Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." *Certified Fire Prot.*, 128 Nev. at 378, 283 P.3d at 255 (internal quotations omitted). "A meeting of the minds exists when the parties have agreed upon the contract's essential terms." *Id.*

Here, the diversion agreement stated that the Rolphs and the Whitmeres were the owners of the Sheridan Creek water rights and, collectively as grantors, granted the Bentleys' predecessor-in-interest, Lodato, the right to divert some or all of the Sheridan Creek water to maintain water levels in ponds then existing on Lodato's property. However, only the Whitmeres and Lodato signed the agreement. The signature lines for the Rolphs are blank.

The Bentleys argue that because the Whitmeres, not the Rolphs, had the rights to North Sheridan Creek, the diversion agreement is valid as to the waters of North Sheridan Creek, even though the Rolphs did not sign it.[6] However, in order for there to be a valid contract formation, there must be a meeting of the minds. *See id.* The agreement acknowledges that the Whitmeres and the Rolphs own the water rights to the Sheridan Creek and their agreement to grant Lodato the right to divert Sheridan Creek onto existing streams and ponds on Lodato's property. The agreement was between four grantors (the two Rolphs and the two Whitmeres) and one grantee, Lodato, as to the Sheridan Creek

_____

[6]The State Engineer and the Intervenors dispute whether the Whitmeres received the water rights to North Sheridan Creek from the Rolphs at the time the diversion agreement was signed. However, because we conclude that the agreement would be invalid even if the Whitmeres had the water rights at the time the diversion agreement was signed, we need not reach that issue.

water rights. Only two of the grantors signed it. The agreement does not contemplate any additional, separately held water rights by the two grantors who signed the agreement and thus the Bentleys' arguments in that regard are unsupportable. Therefore, the district court properly determined that it fails, and we hold that its finding that the diversion agreement was not a valid contract is not clearly erroneous and is supported by substantial evidence.

*The doctrine of laches does not apply*

The Bentleys argue that because the Intervenors did not challenge the diversion agreement from the time it was created in 1987 until the Bentleys filed their exceptions to the FOD in 2008, the Intervenors should be barred from challenging the diversion agreement by the doctrine of laches. Specifically, the Bentleys argue that the Intervenors' delay in challenging the diversion agreement prejudiced the Bentleys because they purchased the property with the belief that the property carried with it the right to a continuous flow of water from the North Sheridan Creek.

> Laches is an equitable doctrine which may be invoked when delay by one party works to the disadvantage of the other, causing a change of circumstances which would make the grant of relief to the delaying party inequitable. To determine whether a challenge is barred by the doctrine of laches, this court considers (1) whether the party inexcusably delayed bringing the challenge, (2) whether the party's inexcusable delay constitutes acquiescence to the condition the party is challenging, and (3) whether the inexcusable delay was prejudicial to others.

*Miller v. Burk*, 124 Nev. 579, 598, 188 P.3d 1112, 1125 (2008) (citation omitted) (internal quotations omitted).

The diversion agreement was recorded with the county recorder's office. Accordingly, the Intervenors had constructive notice of the agreement. *See Allen v. Webb*, 87 Nev. 261, 270, 485 P.2d 677, 682 (1971) (holding that purchasers of realty have constructive notice of recorded deeds in the chain of title). However, evidence was also proffered that prior to the construction of the Bentleys' second pond, the Bentleys and their predecessors in interest never attempted to enforce the diversion agreement. Lastly, the Bentleys testified that while they were unaware of the diversion agreement at the time they purchased the property, their belief that the property had the rights to a continuous flow from North Sheridan Creek was an important factor in their decision to purchase the property.

Because the diversion agreement was not enforced prior to the Bentleys' purchase of their property, we hold that the Intervenors did not inexcusably delay challenging the diversion agreement and that any delay did not constitute acquiescence to the diversion agreement's validity. Furthermore, as the Bentleys were unaware of the diversion agreement at the time they purchased the property, any delay by the Intervenors in challenging the agreement was not prejudicial to the Bentleys. Therefore, we hold that the doctrine of laches does not apply to the current case.[7]

---

[7]We also note that the doctrine of laches would only apply as to the Intervenors' arguments that the diversion agreement is invalid. Here, the district court also found that the Bentleys breached the diversion agreement by using the water for a nonpermissible consumptive use. Therefore, even if the doctrine of laches applied, it would not apply to the

*continued on next page...*

*The statute of limitations had not run*

The Bentleys argue that because the statute of limitations to quiet title is five years in Nevada, the Intervenors were time-barred from challenging the validity of the diversion agreement.

NRS 11.070 states:

> No cause of action or defense to an action, founded upon the title to real property, or to rents or to services out of the same, shall be effectual, unless it appears that the person prosecuting the action or making the defense, or under whose title the action is prosecuted or the defense is made, or the ancestor, predecessor, or grantor of such person, was seized or possessed of the premises in question within 5 years before the committing of the act in respect to which said action is prosecuted or defense made.

Here, although the diversion agreement was recorded in 1987, it was not enforced until 2008 when the Bentleys built their second pond and prevented water from flowing to the Intervenors. Therefore, the Bentleys did not seize or possess the North Sheridan Creek water until 2008 and the statute of limitations did not begin to run until that time. Because the current action began with the State Engineer's filing of the FOD with the district court in 2008, we hold that the challenge was appropriately brought within the statute of limitations period.[8]

---

*...continued*

district court's finding that the agreement was unenforceable due to breach by the Bentleys.

[8]Similarly to the Bentleys' argument regarding laches, we note that the Bentleys' statute of limitations argument would also only apply as to the issue of whether the diversion agreement is invalid. Here, the district court also found that the Bentleys breached the diversion agreement by

*continued on next page...*

*Attorney fees*

*The order for attorney fees was incorporated in the final judgment*

The Bentleys argue that the Intervenors' claim for attorney fees is based on an order entered on January 4, 2013, approximately 21 months prior to the entry of the final decree on September 29, 2014. The Bentleys further argue that this decree made no reference to attorney fees, costs, or the January 4, 2013, order and, therefore, Intervenors are precluded from arguing that the 2013 order somehow became final upon entry of the decree and is thus enforceable. The Bentleys also argue that the interlocutory order did not affect the final judgment, and thus, pursuant to the Third Circuit Court of Appeals case of *In re Westinghouse Securities Litigation*, 90 F.3d 696, 706 (3d Cir. 1996), the order awarding attorney fees did not merge into the final decree.

This court need not go as far as the Third Circuit Court of Appeals, as we have long held that prejudgment orders merge into the final judgment on appeal. *Consol. Generator-Nevada, Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1312, 971 P.2d 1251, 1256 (1998). Our caselaw does not recognize an exception to the merger rule for interlocutory orders that do not affect the final judgment, and we decline to adopt such a rule here. Therefore, the Bentleys' argument is without merit.

---

*...continued*
using the water for a nonpermissible consumptive use. Therefore, even if the statute of limitations applied, it would not apply to the district court's finding that the agreement was unenforceable due to the breach by the Bentleys.

SUPREME COURT
OF
NEVADA

(O) 1947A

23

*Intervenors were a prevailing party*

The Bentleys contend that the Intervenors are not the prevailing party because all five of the Bentleys' exceptions were resolved prior to trial in the Bentleys' favor and because the Intervenors only prevailed on three of their six claims, having abandoned the rest. The Bentleys further argue that it was actually the Bentleys who were the prevailing party.

"A party can prevail under NRS 18.010 if it succeeds on any significant issue in litigation which achieves some of the benefit it sought in bringing suit." *Valley Elec. Ass'n v. Overfield*, 121 Nev. 7, 10, 106 P.3d 1198, 1200 (2005) (internal quotations omitted). "To be a prevailing party, a party need not succeed on every issue," but the action must proceed to judgment. *Las Vegas Metro. Police Dep't v. Blackjack Bonding, Inc.*, 131 Nev., Adv. Op. 10, 343 P.3d 608, 615 (2015). Voluntary dismissal of some claims does not preclude a finding of a prevailing party for the remaining claims. *See Semenza v. Caughlin Crafted Homes*, 111 Nev. 1089, 1096, 901 P.2d 684, 688 (1995).

The fact that the Intervenors abandoned half of their claims before proceeding to trial does not negate the fact that they prevailed on the remaining claims. *See id.* By voluntarily dismissing three of their claims, the Intervenors merely refined their action against the Bentleys. *See id.* Since these claims proceeded to judgment, the district court did not abuse its discretion in finding that the Intervenors were the prevailing party.

Additionally, the Bentleys' argument that they are the prevailing party because their exceptions were resolved by stipulation is unpersuasive. Because stipulations as to a claim result in neither party being considered a prevailing party, the Bentleys cannot be deemed to be a

prevailing party. *See Dimick v. Dimick*, 112 Nev. 402, 404-05, 915 P.2d 254, 255-56 (1996). Furthermore, the Bentleys' exception on the enforceability of the diversion agreement actually went to trial, with the district court ruling in favor of the Intervenors by determining that the diversion agreement was invalid. Therefore, we hold that the district court did not abuse its discretion by finding that the Intervenors were the prevailing party.[9]

> *The district court did not abuse its discretion in awarding attorney fees*

NRS 18.010(2)(b) allows a district court to award attorney fees to a prevailing party when the court finds that the claim of the opposing party "was brought . . . without reasonable ground or to harass the prevailing party." "To support such an award, . . . there must be evidence in the record supporting the proposition that the complaint was brought without reasonable grounds or to harass the other party." *Khan v. Morse & Mowbray*, 121 Nev. 464, 479, 117 P.3d 227, 238 (2005) (internal quotations omitted). Thus, "[s]uch an analysis depends upon the actual circumstances of the case." *Semenza*, 111 Nev. at 1095, 901 P.2d at 688 (internal quotations omitted). However, "[t]he decision to award attorney fees is within the sound discretion of the district court and will not be overturned absent a manifest abuse of discretion." *Khan*, 121 Nev. at 479, 117 P.3d at 238 (internal quotations omitted).

---

[9]The Bentleys also argue that the district court abused its discretion by failing to apportion attorney fees between causes of action that it found colorable and those that were groundless. However, there is no indication that the district court found *any* of the Bentleys' causes of action colorable. Therefore, we hold that the district court did not abuse its discretion by not apportioning attorney fees between causes of action.

Here, the district court's decision to award attorney fees was grounded on the following findings and conclusions:

## F. ATTORNEY FEES:

44. Mr. Bentley, through intimidation and threat, attempted to bully the Intervenors, acting in a manner to harass and financially exhaust the Intervenors.

45. [The] Bentleys brought and maintained their Exception No. 1 relating to the Diversion Agreement without reasonable grounds.

46. The Diversion Agreement contains a clause that allows attorney fees to the prevailing party in the event a lawsuit is brought to enforce or interpret the Agreement.

47. [The] Bentleys asserted that the Agreement dated August 5, 1986, and the letter recorded August 6, 1986, granted an additional right to divert the flow of Sheridan Creek through the ponds. (Exhibit 7.) However, those documents did not grant any additional rights and are invalid.

48. The Bentleys proceeded in this matter under an erroneous theory and under an erroneous thought process, and therefore, their action was maintained by them without reasonable grounds.

## CONCLUSIONS OF LAW

. . . .

20. The Intervenors are adjudged to be the prevailing parties for purposes of an award of attorney fees to be supported by a separate motion or memorandum for the same pursuant to NRCP 54(d) and NRS 18.010.

SUPREME COURT
OF
NEVADA

(O) 1947A

The Bentleys maintained that the diversion agreement was valid despite it not being signed by two of the parties necessary to the execution of the agreement. The Bentleys further attempted to strike the Intervenors' opposition to the Bentleys' exceptions as an improper pleading, despite the fact that, as an adverse party in a statutory adjudication of a water system, the Intervenors had the right to oppose the Bentleys' exceptions. While it is arguable as to whether the Bentleys' contentions had merit, in our view, they were not so clearly meritorious as to render the district court's finding that they were unreasonable and brought for the purpose of harassment, to be a manifest abuse of discretion. Therefore, we hold that the district court did not abuse its discretion by awarding attorney fees to the Intervenors.

*Sufficient evidence supported the district court's finding that the Intervenors incurred fees*

The Bentleys argue that the Intervenors' obligation for attorney fees was illusory and not actually incurred because "Hall Ranches was a self-represented entity, with Tom Hall as its owner and attorney." Therefore, because Hall Ranches was one of the Intervenors in this case and Thomas Hall was the Intervenors' attorney, Thomas Hall was a pro se litigant not entitled to recover attorney fees. The Bentleys cite to *Sellers v. Fourth Judicial District Court*, 119 Nev. 256, 259, 71 P.3d 495, 497-98 (2003), and *Lisa v. Strom*, 904 P.2d 1239, 1243 (Ariz. Ct. App. 1995), for this proposition.

*Sellers* and *Strom* are inapposite here, as both deal with an attorney representing himself pro se. *See Sellers*, 119 Nev. at 259, 71 P.3d at 497-98 ("[A]n attorney pro [se] litigant must be genuinely obligated to pay attorney fees before he may recover such fees."); *see also Lisa*, 904 P.2d at 1243 ("[A]n additional, indispensable requirement to an award of

attorney[ ] fees to *pro se* attorneys [is] a genuine financial obligation on the part of the litigants to pay such fees."). Here, the record indicates that Thomas J. Hall, Esq., disclosed to the district court that he was a minority owner of Hall Ranches, LLC. Although Hall is a minority owner, the record does not reflect that he represented himself in pro se; rather, he represented Hall Ranches, LLC, an existing and valid limited liability company in Nevada, holding water rights V-06340 and V-06341, as well as the other Intervenors. Furthermore, the Bentleys provide no evidence in support of their contention that the Intervenors were not genuinely obligated to pay attorney fees to Hall. Accordingly, we hold that the district court did not abuse its discretion in awarding attorney fees to the Intervenors.[10]

*Conclusion*

The district court had jurisdiction to consider the imposition of a rotation schedule on the North Sheridan Creek water rights holders. Furthermore, the State Engineer acted within his capacity as an officer of the court in enforcing the district court's order imposing a rotation schedule and did not act arbitrarily and capriciously. Next, the district court's finding that the diversion agreement proffered by the Bentleys was invalid was not clearly erroneous and is supported by substantial evidence. Even if the diversion agreement was valid, the agreement was

---

[10]Because we are affirming the district court's orders denying the petitions for judicial review, we also affirm the district court's order awarding Intervenors costs in those actions.

breached by Bentley. Lastly, the district court did not abuse its discretion in awarding the Intervenors attorney fees. Therefore,

ORDER the judgment of the district court AFFIRMED.

_____, C.J.
Parraguirre

_____, J.
Hardesty

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Saitta

_____, J.
Gibbons

PICKERING, J., concurring in part and dissenting in part:

I dissent from the foregoing order to the extent that it affirms the imposition of mandatory rotation schedules on holders of equal priority vested water rights in the North Diversion of Sheridan Creek. This issue was not part of the proceedings before the State Engineer that culminated in the final order of determination (FOD). The footnote on

page 199 of the 235-page FOD on which the majority relies to deem mandatory rotation fairly in play in the proceedings below says only that, "all parties will have to share the water shortage during periods of low flow. The total diversion from either the north or south split can be used in its entirety in a rotation system of irrigation." Although this footnote permits water rights holders to agree to rotation schedules during periods of low flow—"the total diversion . . . *can* be used . . . in a rotation system"—I do not read it to say the rights may be subjected to mandatory or forced rotation, over the objection of a vested, equal-priority, water-rights holder. Confirming this reading, Paragraph XIV of the FOD, "Duty of Water," states:

> ### 3. Rotation and Use of Water
>
> *Claimants of vested water rights* and those owners of water rights acquired through the appropriative process from a common supply *may rotate the use of water* to which they are collectively entitled *based on an agreement*, so as to not injure nonparticipants or infringe upon their water rights, which is subject to approval by the State Engineer. The purpose is to enable irrigators to exercise their water rights more efficiently, and thus to bring about a more economical use of available water supplies in accordance with their dates of priority. *NRS § 533.075.*

(emphasis added). The foregoing paragraph of the FOD—text, not footnote—says that water rights holders *may agree* to rotation schedules, not that rotation schedules *may be forced on* nonconsenting water rights holders. And, indeed, this is what NRS 533.075, which the FOD cites, says too: "To bring about a more economical use of the available water supply, it shall be lawful for water users owning lands to which water is appurtenant to rotate in the use of the supply to which they may be

collectively entitled, . . . to the end that each user may have an irrigation head of at least 2 cubic feet per second."

The mandatory rotation orders at issue on this appeal originated in a statutory water rights adjudication undertaken pursuant to NRS 533.090 through NRS 533.435. After years of administrative proceedings, the State Engineer filed his FOD with the district court, whereupon a hearing date was set as per NRS 533.160(6). The FOD "defin[ed] the several rights to the waters of" North Diversion of Sheridan Creek, NRS 533.160(1); pursuant to NRS 533.170(1), "exceptions" to the FOD by "all parties in interest who are aggrieved or dissatisfied with" it were due 5 days before the scheduled district court hearing. By law, "*[t]he [FOD] and the statements or claims of claimants and exceptions made to the [FOD] shall constitute the pleadings, and there shall be no other pleadings in the cause.*" NRS 533.170(2) (emphasis added).

Insofar as is relevant to these appeals, the FOD defined the water rights in North Diversion of Sheridan Creek as vested, with equal priority dates of 1852. Notwithstanding the footnote on page 189 of the FOD on which the majority relies, I submit, for the reasons set out above, that the FOD did not give these vested water rights holders fair notice that their adjudicated water rights were or properly could be subject to mandatory, non-consensual rotation schedules if they did not file exceptions to the FOD. Nor do I agree that the exceptions the Bentleys filed, and the intervenors' responses thereto, made mandatory rotation an issue in the district court proceeding. To be sure, the Bentleys referenced rotation in their exceptions. But, by later stipulation and order, all parties agreed that only the Bentleys' Diversion Agreement, not mandatory rotation, was being litigated. *Compare* NRS 533.170(5) (providing that

proceedings under NRS 533.170, "shall be as nearly as may be in accordance with the Nevada Rules of Civil Procedure"), *with* NRCP 16 (stating that a pretrial conference "order shall control the subsequent course of the action unless modified by a subsequent order" and then, "only to prevent manifest injustice").

Predictably, given the pleadings, the evidence at trial focused on the Diversion Agreement and the impact the Bentleys' construction of a second pond in reliance thereon had on the intervenors' water rights. That evidence showed that the Bentleys' construction of a second pond adversely impacted downstream users during periods of low water flow. Citing this evidence, the State Engineer's lawyer orally asked, in closing argument, that the court direct the State Engineer to impose rotation schedules on persons holding vested water rights in North Diversion of Sheridan Creek when the flow drops below 2.0 cfs (this is the level NRS 533.075 references in declaring voluntary rotation agreements "lawful . . . to the end that each user may have an irrigation head of at least 2 cubic feet per second"). With no amendment to the pleadings, the district court accepted the State Engineer's lawyer's suggestion: In addition to invalidating the Bentleys' Diversion Agreement, the district court's findings of fact and decree affirming the FOD respecting North Sheridan Creek,[11] directs that "[w]hen the combined flow from the North Diversion of Sheridan Creek and tributaries drops below 2.0 cfs, the State

---

[11]As the majority recites, the FOD encompassed rights to more than just the North Diversion of Sheridan Creek, so the decree did not become final and appealable immediately. For simplicity's sake, proceedings not related to North Diversion of Sheridan Creek water rights are not discussed in this dissent.

Engineer shall impose a rotation schedule." In both 2012 and 2013, the flow dropped below 2.0 cfs and the State Engineer imposed a rotation schedule. The Bentleys, the Bardens, and Joy Smith then petitioned for judicial review. Citing its earlier findings of fact and decree, the district court rejected the petitioners' legal and factual challenges to the mandatory rotation schedules imposed on them. These consolidated appeals followed.

The majority upholds the mandatory rotation schedules. Given the procedural history set forth above, this result is insupportable. "It is . . . settled in this state that the water law and all proceedings thereunder are special in character and the provisions of such law not only lay down the method of procedure, but strictly limit it to that provided." *G. & M. Props. v. Second Judicial Dist. Court*, 95 Nev. 301, 305, 594 P.2d 714, 716 (1979) (quoting *Application of Filippini*, 66 Nev. 17, 27, 202 P.2d 535, 540 (1949) (citing *Ruddell v. Sixth Judicial Dist. Court*, 54 Nev. 363, 17 P.2d 693 (1933) and *In re Water Rights in the Humboldt River Stream Sys.*, 49 Nev. 357, 246 P. 692 (1926))). Here, the pleadings, as defined in NRS 533.170(2), gave no notice that the vested rights dating back to 1852 determined by the State Engineer were sought to be abridged by imposing a mandatory rotation schedule on their holders. On the contrary, in paragraph XIV of the FOD, reprinted above, the State Engineer abjures authority to mandate rotation schedules, citing NRS 533.075, which limits its authorization of rotation schedules to agreed-upon schedules, not mandated ones.[12] If the district judge wanted to consider mandatory

_____

[12]Of note, the State Engineer does not, even in his briefs on appeal, assert direct authority to impose mandatory rotation schedules on nonconsenting vested water rights holders. Rather, the State Engineer
*continued on next page...*

rotation schedules, he could and should have referred the matter back to the State Engineer pursuant to NRS 533.180 ("The court may, if necessary, refer the case or any part thereof for such further evidence to be taken by the State Engineer as it may direct, and may require a further determination by the State Engineer, subject to the court's instructions."), but he did not. Without having been developed in the proceedings before the State Engineer, or in district court, and hence fully vetted both factually and legally by all interested persons, the mandatory rotation schedules the district court ordered were not fairly made a part of the special statutory proceedings authorized by NRS 533.090 through NRS 533.435.

The procedural deficiencies give rise to related legal and evidentiary deficiencies. As noted, NRS 533.075 authorizes water users to agree among themselves to rotation schedules but it does not, by its plain terms, authorize the State Engineer or the courts to mandate them over objection—indeed, the State Engineer does not argue otherwise. While other jurisdictions have, on occasion, imposed mandatory water rotation schedules, it is not clear that it is appropriate to do so in Nevada, where our water law rests on the prior appropriation doctrine, not riparian rights. *Cf. Colorado v. New Mexico*, 459 U.S. 176, 179 n.4 (1982)

---

...*continued*

defends his actions by relying on the district court's findings of fact and conclusions of law, which the State Engineer argues require him to impose rotation schedules, without regard to whether, independent of the court's order, he has the authority to so require. *See* Answering Brief of the State Engineer, at 19 ("Smith and Barden argue throughout their brief that the State Engineer imposed the rotation schedules by [ ]his own authority. However, . . . the State Engineer only implemented rotation schedules in compliance with orders of the decree court.").

("Appropriative rights are fixed in quantity; riparian rights are variable depending on streamflow and subject to reasonable uses of others."). Further complicating matters, the record suggests some of the water rights holders in the North Diversion of Sheridan Creek use the water for irrigation, while others use theirs for domestic and stock and wildlife watering purposes, which do not as readily lend themselves to rotation. *Cf. Union Mill & Mining Co. v. Dangberg*, 81 F. 73, 122 (C.C.D. Nev. 1897) (allowing rotation under the riparian rights doctrine for purposes of irrigation and milling but noting that, "The respondents are also entitled to a decree allowing them, and each of them, *at all times*, to take and use a sufficient quantity of water from the river for their household and domestic purposes, and for watering their stock.") (emphasis added). Legal and factual issues as complex and important as these deserve full development before the State Engineer and the district court, with input from all affected water rights holders.

For these reasons, while I agree with the majority in its decision affirming the district court's invalidation of the Diversion Agreement, I respectfully dissent. I would reverse and remand to the district court with instructions to refer the matter to the State Engineer to determine, in the first instance, whether the law or the evidence supports imposing a mandatory rotation schedule on the holders of vested water rights in the North Diversion of Sheridan Creek.

_____, J.
Pickering

cc: Hon. Nathan Tod Young, District Judge
Dyer, Lawrence, Penrose, Flaherty, Donaldson & Prunty
Matuska Law Offices, Ltd.
Attorney General/Carson City
Law Offices of Thomas J. Hall
Douglas County Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A